MOORE M. REYNOLDS, *Sheriff, etc. v.* ARTHUR J. GRIFFITH *et al.*

(No. 9543)

Submitted April 5, 1944.  Decided May 2, 1944.

Kenna, Judge, absent.

*Steptoe & Johnson* and *James M. Guiher*, for plaintiffs in error.

*Hardin R. Harmer* and *Maxwell & Young*, for defendant in error.

Riley, Judge:

Moore M. Reynolds, Sheriff of Harrison County, West Virginia, for the use and benefit and at the relation of Olice Jenkins, brought this action in debt in the Circuit Court of Harrison County against Arthur J. Griffith and The Fidelity & Casualty Company of New York, upon the official bond in the sum of five thousand dollars of Griffith, a deputy sheriff of said county, charging that he "did not faithfully perform the condition of said bond". Defendants prosecute this writ of error to a judgment against them entered upon a jury verdict of twenty-five hundred dollars in plaintiff's favor, and assert that the jury verdict is contrary to the weight of evidence, and that the trial court erred in excluding from the jury an

instrument identified as "Bond Application and Indemnifying Agreement", and in, refusing to give defendants' instruction No. 3-A.

Arthur J. Griffith was the duly appointed and acting Deputy Sheriff of Harrison County, and as such had furnished an official bond conditioned upon the faithful performance of his duties as deputy. The bond, executed by him, as principal, and The Fidelity & Casualty Company of New York, as surety, was in full force and effect on July 22, 1939, in the evening of which Griffith and several other deputy sheriffs planned to raid the rooms of Charles Murray located in the Noon Shoe Shop Building on North Third Street, in the City of Clarksburg. Six days prior thereto there had been a raid on the same premises, participated in by state police, Griffith and other county officers, on which occasion the raiding officers had found but one negro man therein, but found some whiskey, gin, and an automatic revolver and a quart of shells. One witness testified that he had seen the place "raided quite often". Between eleven o'clock p. m. and midnight of Saturday, July 22, 1939, Griffith, wearing his deputy's uniform with a seersucker suit over it, and possessing search warrants issued by a justice of the peace commanding, respectively, the seizure of gambling apparatus and liquor and arrest of persons found in the premises described therein, left the sheriff's office and walked to the Noon Building. It was the plan of the raiding officers that Griffith, disguised as he was, should gain entrance to the premises to obtain evidence of unlawful conduct of those persons who were therein. The other officers who were to participate in the raid proceeded by automobile. Griffith testified that he walked up the steps of the building, through a hallway to a closed door leading into a room, which door he opened, and walked into the room where there were twelve or fifteen negro men, about eight of whom were seated around a table playing cards, in the center of which table there were two or three dollars in change; that he opened his coat and told them it

was a raid, and started to pick up the money when, "some fellow struck me in the mouth and from that time on they grabbed me from behind and started hitting me every place they could". Plaintiff's witnesses testified that Griffith came into the room "in a stooped position bent over like that slow, it seemed on tiptoes, and moved at the table and jumped on top of the fellow's back, reaching over", and that when he did so, "the commotion started then and everybody started running out of the place". Olice Jenkins testified that he was merely sitting in the room talking to "the other boys", and that while he did not see Griffith enter the room, he knew him after he came in; that Griffith made no statement that he was an officer but reached for the money on the table; and, thinking that it was a robbery, Jenkins says he "broke to run, and when I got down the hallway within a foot or two, practically to the door, I was shot". The shot had been fired by Griffith during the scuffle between him and several of the occupants of the raided room. Griffith testified, "I fired the shot to get them off of me and to let the other boys know to hurry up". According to Griffith, when the shot was fired three or four persons were striking at him; that he did not fire the shot at any one of them; and that after the shot was fired "they threw me out the door and locked it". Following the shooting, the other officers appeared. Griffith contends that those seated around the table were engaged in the game of stud poker. Some of plaintiff's witnesses deny that there was any card playing, while one of plaintiff's witnesses testified that the men were playing a game of bridge. After Griffith and the other raiding officers returned to the room in which the scuffle had occurred, they then found about thirty-six cents lying on the table. According to testimony introduced on behalf of plaintiff, this sum of money had been placed there by the men in the room for the purpose of purchasing beer.

The bullet struck Jenkins' left thigh and fractured the bone. At the time of the trial the bone had mended, and

he had perfect use of his left leg, but a partial paralysis of his right side developed while plaintiff was in the hospital. There is divergent medical testimony whether the paralysis resulted from the gun shot wound or venereal disease.

Defendants predicate their contention that the jury verdict is contrary to the weight of the evidence on the ground that Griffith was reasonably within his right in firing his gun in self-defense and characterize as significant the fact that plaintiff's own evidence does not negative the assault upon Griffith before he fired the shot. There is a variance of testimony whether he made known that his presence there was in the capacity of a raiding officer, possessed of proper legal process for that purpose. Plaintiff's evidence is a denial that Griffith announced the reason for his presence prior to the time that assault was made upon him, and, believing the testimony offered by plaintiff on this factual question, the jury could readily have justified the assault made upon Griffith by those seated about the table, if they had no knowledge of his official identity. In other words, if Griffith's purpose was to obtain the material he alleged was upon the table, as evidence of gambling, and he reached for it without making known his identity and purpose, the attack upon him was a natural sequence. In *State* v. *Stockton*, 97 W. Va. 46, 52, 124 S. E. 509, this Court stated that:

> "An officer in the performance of his duties * * * is a minister of justice, and entitled to the peculiar protections of the law. Without submission to his authority there is no security; and anarchy reigns supreme. He must of necessity be the aggressor, and the law affords him special protection. * * *."

It is also well settled that officers, in making arrests, may not legally do more than is necessary to bring the person sought to be arrested within the officer's control. Anderson on Sheriffs, Coroners and Constables (1941), Vol. 1, page 133. Defendants' position is that Griffith fired in

self-defense. The record does show that he suffered bodily injury in the affray. The necessity for wounding in self-defense presents a question for jury determination. *State v. Cain*, 20 W. Va. 679; *State v. McCallister*, 111 W. Va. 440, 162 S. E. 484. Though the cases cited deal with criminal law, the "law of self-defense does not vary in the application thereof to felony, misdemeanor and civil cases". *Teel v. Coal & Coke Ry. Co.*, 66 W. Va. 315, 66 S. E. 470, syl. pt. 4. The verdict of the jury is a denial of such necessity. We cannot say that under the circumstances, and in the light of Griffith's own testimony that his reason for firing was "to get them off of me and to let the boys [officers] know to hurry up," the jury's conclusion is without supporting testimony. Moreover, Griffith's statement that he did not "aim the shot at anybody" is not persuasive that he fired in self-defense in an action wherein it is alleged that Griffith "unlawfully, carelessly, negligently, wilfully and wantonly used and discharged said revolver" and, further, where the injured party did not participate in the assault.

Defendants contend too that it was error for the trial court to refuse to admit into evidence an indemnifying agreement under which Griffith obligated himself to reimburse the defendant surety for any recovery by third persons upon the bond. It is argued that this document "may properly be considered as an integral part of the bond, for it was the written application upon which the bond was issued." Code, 6-2-19 and 6-2-3, providing for bonds of deputy sheriffs and the conditions thereof, respectively, make no mention of an indemnifying agreement, and we cannot agree that such agreement is an integral part of the bond. The bond itself is to protect third persons against a deputy's failure faithfully to discharge his duties, whereas by the indemnifying agreement the surety seeks reimbursement for any recovery by a third party, predicated upon the deputy's violation of the condition of the bond. Being irrelevant to the issue involved, the trial court properly rejected the instrument as com-

petent evidence when it was offered by defendants during the introduction of their evidence. But, it is urged that, though it was properly excluded by the trial court when so offered, its competency became apparent when, in argument of the case to the jury, counsel for plaintiff stated, "* * * I say now to you gentlemen that we are not asking anything against Mr. Griffith * * *", and that the pertinency thereof is reflected by an inquiry by a juror whether Griffith would have to pay any verdict returned against the defendants. According to an affidavit of one of defendants' counsel, this inquiry was made before the jury had "retired from the courtroom to resume their deliberations", and the trial court stated, "he could not properly give such an instruction or such information, but did give the jury a copy of the bond sued upon * * *". Whether it was proper for the trial court to advise the jury thereon is not in issue. A study of the juror's inquiry renders doubtful the purpose thereof. Did the juror have in mind that he would absolve the surety if Griffith had to indemnify it; or, that since it was Griffith's misconduct which occasioned liability, the surety should not pay unless Griffith too was responsible therefor? The trial court was of opinion that counsel's statement "turned the verdict for the plaintiff" and that the court informed the jury that "if he was worth it he [Griffith] would have in the end to pay it, then the verdict would have been for the defendants, is my belief." This expression came upon motion to set aside the jury verdict, which was denied despite the belief as indicated. Unquestionably, counsel's statement was made to create a sympathy for the plaintiff, and the argument of plaintiff's counsel that the remarks were not prejudicial is not appealing. But, we find no objection thereto by defendants' counsel whose purpose, as the record shows, was (1) to place in evidence the rejected indemnifying agreement, and (2) to have a directed verdict "now, if he is not asking anything against Mr. Griffith." The record shows no formal objection or request for mistrial. As the

Court observed in *Deitz* v. *County Court of Nicholas County,* 122 W. Va. 296, 300, 8 S. E. 2d 884, "If prejudicial, we think the prejudice was waived."

Refusal to give defendants' instruction No. 3-A is also urged as ground for reversal. The gist thereof was "whether the defendant Arthur J. Griffith *believed* and had reason to believe *that the firing of such shot was necessary*" under the circumstances. (Italics supplied). By defendants' instruction No. 2 the jury was told, in part, that if it believed that Griffith while being assaulted "under surrounding circumstances which in your opinion justify a belief on his part that he was then and there in imminent peril of loss of life or serious bodily injury", and that "such assault and other circumstances justified a belief that he was in imminent peril of loss of life or serious bodily injury and was not negligent in firing the revolver", it should return a verdict for defendants. In view of this instruction, defendants were not prejudiced by the court's refusal to give instruction No. 3-A. In this regard, instruction No. 2 did not expressly place upon defendants the burden of proving that defendant Griffith actually entertained the belief that the firing of the shot was necessary.

For the foregoing reasons the judgment complained of is affirmed.

*Affirmed.*