## FOLK v. UNITED STATES (two cases).
### Civ. A. Nos. 1170, 1171.

United States District Court
W. D. South Carolina, Greenwood Division.
Feb. 5, 1952.

B. E. Nicholson, Joe F. Anderson, Edgefield, S. C., for plaintiff.

John C. Williams, U. S. Atty., Frank E. Jordan, Jr., Asst. U. S. Atty., Greenville, S. C., for defendant.

WYCHE, Chief Judge.

These two actions are brought under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), one for damages for wrongful death, under Sections 411 and 412, Code of Laws of South Carolina, 1942, and the other for damages for conscious pain and suffering under Section 419, Code of Laws of South Carolina, 1942, and were consolidated and tried together before me without a jury.

In compliance with Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon, in the above causes, as follows:

## Findings of Fact

Shortly after daylight, on the morning of Saturday, January 13, 1951, Roy L. Cecil, Criminal Investigator, Alcohol Tax Unit, of United States Treasury Department, hereinafter called the officer, acting within the scope of his employment, and while in the active discharge of his duties, accompanied by Criminal Investigators of the Alchohol Tax Unit, W. C. Elrod, W. H. Wetzel and Cecil D. Martin, together with South Carolina State Constables Charlie Branyon, Elliott J. Long and Clyde R. Jackson, conducted a raid on an illicit distillery for the manufacture of whiskey, in the Morgana section of Edgefield County, South Carolina, at which John Henry Hammond, a colored man, thirty-six years old, a resident of Aiken County, South Carolina, was working, along with three other persons.

The illicit distillery had previously been located and those participating in the raid had been placed at different locations in the proximity of the distillery site. The distillery was in the bed of a creek between high embankments. The officer walked into the distillery site and observed four men, none of whom he knew, working at the distillery. Whether they were there as owner, worker or by-stander, was not known to him. He did not observe any weapons or firearms in or around any of the men, but he drew his forty-five caliber automatic army pistol, which he was then carrying, called to the men "A Federal Officer—don't run". Immediately after hearing these words, the four men at the distillery fled, with John Henry Hammond and another colored man, later ascertained to be Ernest Holmes, running up the embankment side-by-side near the officer.

When the officer started running after Hammond he took the safety off of his loaded forty-five caliber army automatic pistol, and while continuing to hold it in his hand, cocked, with the safety off, pursued John Henry Hammond and Ernest Holmes through the woods and up the hill. A short distance up the hill Ernest Holmes turned to the left, and shortly thereafter ran into Criminal Investigator Cecil Martin and was apprehended.

Hammond continued up the hill with the officer still in pursuit, gaining on him, with his cocked, loaded pistol with the handle in his hand, with the safety off. At a point approximately one hundred yards from the distillery, and when the officer was "20 or 25 steps" behind him, Hammond jumped over a ditch, and when the officer attempted to jump the same ditch in pursuit with his cocked, loaded pistol, with the handle in his hand, with the safety off, he fell, discharging the pistol in the direction Hammond was fleeing, the bullet from which entered the right forearm of Hammond, entering from the back of the arm, severing an artery, and coming out in the front. Hammond proceeded up the hill with the officer following him to the crest of the hill, a distance of sixty-five yards from the place where his pistol was discharged, and in the course of pursuit to the top of the ridge, he discharged his pistol two more times as signal shots to his associates. It is customary to fire "two or three" shots as a signal to notify other officers that, one is fleeing through the woods, or that assistance is needed.

At no time in the course of flight did Hammond offer any resistance, draw any weapon, or act in any manner indicating any intention of offering any resistance to the officer, or to do him any bodily harm. Hammond was unarmed and at all times during the chase was fleeing from the officer.

After looking for Hammond about "five or ten minutes", the officer returned to the site of the distillery with Hammond's shoes in his hand. He made no statement at that time to the other officers with him on the raid of having fallen in the ditch and discharging his pistol, or of having chased the deceased with a cocked, loaded pistol, with the handle in his hand, with the safety off. He did not say anything to anyone about these facts until the following Sunday night after Hammond's body was found.

The officer remained in the vicinity of the distillery, with the others associated with him in the raid, approximately three hours and no further search was made for Hammond.

The following Sunday afternoon, January 14, 1951, Hammond's body was found by friends, who were searching for him at the instigation of members of his family, after he failed to return home.

The body was found in a ditch at the bottom of the hill, one hundred, ten yards from the crest of the hill, where the officer had stopped in his pursuit of Hammond. Hammond had bled to death from the bullet wound in his arm.

On Monday, January 15, 1951, blood was found by another officer on several trees at the crest of the ridge at or near the point where the officer ceased his pursuit of Hammond.

The terrain from the distillery site to where the body of Hammond was found, and along the course of his flight, consisted of woodland from which all large timber had been cut, with some undergrowth, with visibility unhampered, except by the hill and a few small scattered pine trees.

A Criminal Investigator of the Alcohol Tax Unit is instructed by the Deputy Commissioner of Internal Revenue to go armed at all times for the "defense" of himself and his fellow officers. There are no instructions "for an officer to pull out his gun and take off the safety" to pursue a man running from him through the woods.

Of those participating in the raid only the officer and W. C. Elrod testified.

Hammond was thirty-six years of age at the time of his death, in good health, worked regularly and had an average income of $45 per week. His mother, Fannie M. Hammond, with whom he resided, is sixty-five years old, practically blind and crippled, in bad health, and solely dependent on him for her support and livelihood, and to whom he contributed approximately $78 per month, for food, clothing and medicine.

Hammond had a life expectancy of 31.07 years.

There is no evidence that Hammond suffered any shock, pain, mental or otherwise, after being shot, while conscious and before bleeding to death. However, the court will assume that he knew he was shot; that he suffered some shock and some pain before losing consciousness.

It is admitted that J. R. Folk is the duly appointed administrator of the estate of John Henry Hammond, and brings Civil Action Number 1170 for the benefit of Fannie M. Hammond, the mother of John Henry Hammond.

It is agreed that Louise Turner Hammond, the former wife of John Henry Hammond, abandoned John Henry Hammond approximately eight years ago, and shortly thereafter married another man, without having obtained a divorce, and that she was at the time of the death of John Henry Hammond, and now is, living with another man and going by the name of Louise Turner Hammond Anderson, and by reason of these facts she is barred and estopped from claiming any benefit under Section 412, Code of Laws of South Carolina, 1942, and that any recovery by plaintiff in this action will be for the benefit of Fannie M. Hammond, the mother of John Henry Hammond, deceased.

Civil Action Number 1171 is brought by J. R. Folk, as Administrator, for the benefit of the estate of John Henry Hammond.

It is further admitted by the pleadings that the officer was acting within the scope of his employment and in the discharge of such duties in conducting the raid upon the distillery.

It is admitted that the officer was using a forty-five caliber army automatic pistol (Model 1911, United States Army), and agreed that I am permitted to examine one as evidence in this case. When a cartridge from the magazine is fed into the chamber of the pistol, it is automatically cocked. When the safety on the pistol is pushed up to the safety position, the pistol cannot be fired. The safety cannot be put on or *taken off* unless the pistol is cocked; the safety cannot be *moved* unless the pistol is cocked. The pistol also has a grip-safety, which is just under the hammer of the pistol on the back of the handle. The pistol cannot be fired unless it is cocked; it cannot be fired unless the safety is off and the grip-safety is pressed and the trigger is pulled; it cannot be fired by pulling the trigger unless the pistol is cock-

ed, the safety off, and the grip-safety is pressed at the same time the trigger is pulled. Knowing the pistol as I do, and from an examination of one as evidence, and from the evidence in the case, I find, that when he was pursuing Hammond, the officer held the pistol by the handle, cocked, with the safety off and his finger inside the trigger guard and his hand over the grip-safety. Otherwise, in my opinion, the pistol could not have been discharged, unless there was something mechanically wrong with it, and there is no evidence to indicate that there was.

The officer had used the army automatic pistol in two world wars and had had many years' experience as a Criminal Investigator, Alcohol Tax Unit, United States Treasury Department, and when he ascertained that the parties operating the distillery were unarmed, and not knowing who they were, or in what capacity they were there, he knew or should have known that he had no right to pursue the fleeing Hammond through the woods, over rough terrain, with a cocked, loaded automatic pistol in his hand with the safety off and his finger inside the trigger guard and his hand over the grip-safety. Such action on the part of the officer, in my opinion, was negligence. He should have foreseen that such handling of his highly dangerous pistol could or would cause injury or death to plaintiff's intestate.

After his pistol was discharged while he was "20 or 25 steps" behind Hammond, he should have known that the pistol was discharged in the direction in which Hammond was fleeing and he owed him the duty to make a reasonable search of the entire area to ascertain if any injury or death had been inflicted. Although he remained at the distillery site more than three hours he did not look for Hammond more than "five or ten minutes". With the assistance of all the six other officers he could have found Hammond and probably saved his life. Other officers, after Hammond's body was discovered the next day, found blood on the ground and on two of the trees in the vicinity. His failure to make a reasonable search under all the circumstances and his failure to notify the other officers of his pursuit and of the discharge of his pistol during the pursuit of Hammond was negligence.

### Conclusions of Law

(1) This court has jurisdiction of both causes of action.

(2) The defendant's employee, while acting within the scope of his employment, was guilty of actionable negligence, which was the direct and proximate cause of plaintiff's intestate's death.

(3) The negligence of defendant's employee was such that the defendant, if it had been a private person, would be liable to the plaintiff in both cases under the law of South Carolina, where the injuries and death occurred.

(4) The pertinent statutes of South Carolina in Civil Action Number 1170 are as follows:

"§ 411. Civil action for wrongful acts causing death.—Whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person or corporation who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the killing in law a felony."

"§ 412. Beneficiaries of action for wrongful death—damages recoverable—distribution.—Every such action shall be for the benefit of the wife or husband and child, or children, of the person whose death shall have been so caused; and if there be no such wife, or husband, or child, or children, then for the benefit of the parent or parents; and if there be none such, then for the benefit of the heirs at law or the distributees of the person whose death shall have been caused and shall be brought by or in the name of the executor or administrator of such person; and in every such action the jury may give

740

such damages, including exemplary damages where such wrongful act, neglect or default was the result of recklessness, wilfulness or malice, as they may think proportioned to the injury resulting from such death to the parties respectively, for whom and .for whose benefit such action shall be brought. And the amount so recovered shall be divided among the before mentioned parties, in such shares as they would have been entitled to if the deceased had died intestate and the amount recovered had been personal assets of his or her estate."

(5) The pertinent statute of South Carolina in Civil Action Number 1171 is as follows: "§ 419. Survival of right of action.—Causes of action for and in respect to any and all injuries and trespasses to and upon real estate and any and all injuries to the person or to personal property, shall survive both to and against the personal or real representative (as the case may be) of the deceased persons, and the legal representatives of insolvent persons, and defunct or insolvent corporations, any law or rule to the contrary notwithstanding."

(6) The wife of a deceased person living in adultery with another man, before plaintiff's intestate's death, under the South Carolina law, was not a "widow" under the wrongful death statute, and the right of recovery under the state statute for death accrued to plaintiff's intestate's mother. Lytle v. Southern Ry.— Carolina Division, 171 S.C. 221, 171 S.E. 42, 90 A.L.R. 915.

(7) With reference to Civil Action Number 1170, it has been held by the South Carolina Supreme Court, that a wife voluntarily leaving her husband without sufficient legal excuse and subsequently marrying another man, without making diligent or reasonable inquiry to ascertain whether or not her lawful husband was living, relinquished her right to dower and distributive share of husband's estate under South Carolina statutes. Moore v. Robinson et al., 139 S.C. 393, 137 S.E. 697.

(8) "* * * Firearms, however, are dangerous instrumentalities, and since their possession or use is attended by extraordinary dangers, a person having firearms in the vicinity of others is bound to exercise extraordinary care, sometimes described as the utmost care or a very high degree of care, and if another is injured in his person or property as a result of the discharge of such firearms, even though the discharge is accidental or unintentional, provided it is not unavoidable, the person whose negligence is the proximate cause of the injury is liable in an action for damages." 68 C.J., pages 71–73.

(9) The South Carolina Supreme Court has held that one guilty only of ordinary negligence in handling a pistol which resulted in the death of a by-stander, may be convicted of involuntary manslaughter. State v. McCalla, 101 S.C. 303, 85 S.E. 720; see also, State v. Barnett, 218 S.C. 415, 63 S.E.2d 57.

In the cases of Rutledge v. Small et al., [Sowell v. Same], 192 S.C. 254, 6 S.E.2d 260, the Supreme Court of South Carolina held that actions for wrongful death against the sheriff and his bondsman where it was alleged that the deputy sheriff was engaged in a lawful duty as deputy sheriff, but was performing lawful duties in an unlawful, negligent and careless manner, causing injuries and death, were not subject to demurrer.

In the case of City of Charleston v. Dawson, 97 W.Va. 55, 125 S.E. 234, the Supreme Court of Appeals of West Virginia, declared that in an action for wrongful death, where a dangerous instrument such as a loaded pistol is held in readiness to fire, by a defendant, and it is shown that such pistol was under the control and management of the defendant, and that said pistol while so held is discharged, and as result of such discharge death comes to another, the question as to whether or not the action arose from the want of due care upon the part of the defendant is a question for the jury.

The case of Reynolds v. Griffith, 126 W.Va. 766, 30 S.E.2d 81, 83, involves the right of an officer to discharge a pistol in a raid on a gambling room. I agree with what the West Virginia Court said in this case that " 'An officer in the performance

of his duty * * * is a minister of justice, and entitled to the peculiar protection of the law. Without submission to his authority there is no security, and anarchy reigns supreme. He must, of necessity, be the aggressor, and the law affords him special protection. * * *'

"It is also well settled that officers, in making arrests, may not legally do more than is necessary to bring the person sought to be arrested within the officer's control." In this case the court held that the finding, that there was no necessity for shooting in self-defense, was sustained by the evidence and affirmed a judgment for the plaintiff for injuries sustained from the shooting.

Hammond did not know and could not have foreseen, or reasonably anticipated that when he ran, the officer would follow him with a cocked, loaded pistol in his hand with the safety off and his finger in the trigger guard. The officer did not call on Hammond to halt, or warn him that if he did not halt he would fire. This is not a case of an officer acting in self-defense. It is not a case of an officer intentionally shooting his pistol to effect an arrest. The officer did not know in what capacity Hammond was at the distillery. There is no evidence that he saw him doing anything illegal. This is a case of negligence. It is my opinion that the officer was negligent in acting as he did on this occasion and that his negligence was the proximate cause of Hammond's death.

(10) The measure of damages prescribed under the wrongful death statute is as follows: " * * * the jury may give such damages, * * * as they may think *proportioned* to the injury *resulting* from such death to *the parties* respectively, for whom and *for whose benefit* such action shall be brought."

In this case the beneficiary is Hammond's mother, who, under the testimony, was sixty-five years old, crippled, ill and in bad health.

■ Taking into consideration the character of the deceased as probably being a law violator, the age and condition of health and longevity of the beneficiary, under all the facts and circumstances of the case, it is my opinion that the damages to be awarded should be the sum of Eight Thousand, Five Hundred ($8,500.00) Dollars, for the wrongful death of John Henry Hammond in Civil Action Number 1170.

■ The measure of damages under the survival statute is for conscious pain and suffering. As heretofore pointed out, there is no evidence upon this question, but I will assume that he suffered some shock and pain after the wound was inflicted and before he became unconscious, and under all the facts and circumstances the plaintiff should recover the sum of Fifteen Hundred ($1,500.00) Dollars, for conscious pain and suffering of John Henry Hammond in Civil Action Number 1171.

■ (11) The attorneys for the plaintiff are entitled to a fee of twenty (20%) per cent. of the recovery to be paid out of said recovery, and not in addition thereof, in each of the cases.

Accordingly, it is ordered, That the plaintiff have judgment against the defendant in Civil Action Number 1170 in the sum of Eight Thousand, Five Hundred ($8,500.00) Dollars, with interest thereon from the date of entry thereof at the rate of four per cent. (4%) per annum, up to, but not exceeding thirty days after the date of approval of any appropriation act providing for payment of the judgment.

It is further ordered, That the plaintiff have judgment against the defendant in Civil Action Number 1171 in the sum of Fifteen Hundred ($1,500.00) Dollars, with interest thereon from the date of entry thereof at the rate of four per cent. (4%) per annum, up to, but not exceeding thirty days after the date of approval of any appropriation act providing for payment of the judgment.

It is further ordered, That attorneys for the plaintiff be paid a fee of twenty (20%) per cent. of the recovery, to be paid out of said recovery and not in addition thereto, in each of the cases.

It is further ordered, That defendant's motion for judgment on pleadings in Civil Action Number 1171 be and the same is hereby overruled.